ANGELUS FUNERAL HOME, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4217–64. Filed January 17, 1967.

*Leo Branton, Jr.,* for the petitioner.
*Richard Fishman,* for the respondent.

FORRESTER, *Judge:* The respondent has determined deficiencies in the petitioner's income tax as follows:

| Year | Deficiency |
| --- | --- |
| 1959 | $13, 907. 77 |
| 1960 | 11, 427. 51 |
| 1961 | 10, 852. 00 |
| | 36, 187. 28 |

Several issues have been settled by the parties leaving for our determination the following:

(1) Whether this petitioner must include as income in the respective year of receipt, moneys paid to it under two forms of written instruments, each denominated "Pre-Need Funeral Plan Agreement"; and

(2) Whether respondent was correct in determining that amounts received under the earlier of such forms of agreement during the years 1954 through 1958, but omitted from income in such years, should be the basis for an adjustment to petitioner's income tax liability for the year 1959 under the provisions of section 481 of the Code.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is a California corporation, the principal business of which was providing funeral and burial services. During the years in issue and at least as far back as calendar year 1954 it filed its income tax returns with the district director of internal revenue at Los Angeles, Calif., on a calendar year, accrual basis.

During the years in issue petitioner entered into written contracts with certain individuals which contracts were designated, and bore the heading, "Pre-Need Funeral Plan Agreement" (hereinafter sometimes referred to as contracts).

Beginning in 1954 and continuing through August 1961 the form of written agreement which was used provided in pertinent part that the applicant (customer) agreed to pay petitioner the total sum of X dollars, said obligation to be discharged by a relatively small downpayment upon the signing of the contract followed by additional payments of relatively small amounts each month thereafter until the total sum had been paid in full. Petitioner agreed that upon proof of the applicant's death it would apply the total amount theretofore paid toward the cost of applicant's funeral according to applicant's instructions which were given at the same time the contract was signed. The contract provided further that if the applicant died at any place where it was not practicable for petitioner to conduct his funeral service that petitioner would transmit said total amount theretofore paid under the contract to any reputable funeral home which was selected to conduct the funeral service. The contract also provided:

4. The Parties agree that all sums paid by Applicant to ANGELUS shall be held by ANGELUS in irrevocable trust for the uses and purposes herein set forth and set forth in Funeral and Interment Instructions No. —.

5. ANGELUS agrees that it will deposit all sums paid to it under this Agreement in a bank, trust company or savings and loan association and that it will not thereafter withdraw such sums, or any portion thereof, except for the

---

[1] All Code references are to the Internal Revenue Code of 1954.

uses and purposes herein set forth; provided that ANGELUS may at its discretion withdraw such sums for the purpose of re-deposit in some other bank, trust company or savings and loan association.

6. The Parties agree that in consideration of the services performed and to be performed in the collection, custody and conservation of the sums paid to it by Applicant all interest earned on such sums shall accrue to, and shall become the property of, and payable to ANGELUS, as and when earned.

In about September 1961 petitioner stopped using the form which is described immediately above and began using a form which contained provisions which were identical except for the following:

The total amount paid under the contract by the applicant in any given calendar year was called the "Annual Payment" and—

5. ANGELUS may, at its option (a) deposit all or any portion of the sums paid to it under this Agreement in one or more banks, trust companies or savings and loan associations, or (b) at any time before or after such deposit thereof, use all or any portion of such sums as collateral or payment for (i) the costs of any capital improvement to then existing mortuary facilities belonging to ANGELUS, and (ii) the acquisition and improvement of real property.

6. In consideration for its right to use the amounts paid hereunder by Applicant in the manner herein provided, ANGELUS agrees to pay to Applicant on or before the 31st day of December of each year an amount equal to ten per cent (10%) of the Annual Payment (as above defined) made by Applicant during such year.

During and after September 1961 some undetermined number of the applicants who had entered into a "Pre-Need Funeral Plan Agreement" with petitioner prior to that time elected to and did sign the new form of agreement in order to be entitled to the payments of 10 percent therein provided for.

During all of the 3 years in issue and for some time prior thereto petitioner maintained a general checking bank account. In addition thereto it maintained a special checking account (designated a clearing account) at Bank of America, and four savings accounts, each in a different savings and loan company, which savings accounts were designated as trustee accounts.

As petitioner collected amounts under the contracts during the years in issue it deposited them in the clearing account and credited a liability account on its books which was designated "Pre-Arranged Funeral Liability." Thereafter at irregular intervals most of these funds were transferred into one or more of the four trustee savings accounts.

Petitioner did not reflect the amounts collected on the contracts as income in the year the payments were received but returned income from the contracts only when it provided the funeral and burial services upon the death of a particular individual. It did so by debiting the "Pre-Arranged Funeral Liability" account on its books and crediting earned income. Petitioner also reported as income the interest

on the four savings accounts as such interest became due and such amounts are not in dispute.

Commencing in 1959 and for the remainder of the years in issue John L. Hill, the president and the owner of all of petitioner's stock, personally supervised the operation of petitioner's pre-need funeral plan program and the handling of its funds. Prior to that time these responsibilities had been handled by petitioner's treasurer. Hill, on assuming such responsibilities, discovered that some of the pre-need funds had been deposited in petitioner's general checking account instead of in its special clearing account or any of the trustee savings accounts. Upon making such discovery Hill ordered that such funds be immediately segregated and this was accomplished by means of a check drawn on petitioner's general account and transferring such funds to its trustee savings accounts.

As of January 1, 1959, the balances in the four savings accounts and the clearing account totaled $15,609.16, while the ending balance of petitioner's "Pre-Arranged Funeral Liability" account at December 31, 1958, was $24,706.07. Balances of such liability account and the totals in the clearing and savings accounts at the end of each of the years in issue were as follows:

| Date | Prearranged funeral liability | Total clearing and savings accounts |
|---|---|---|
| Dec. 31, 1959 | $30,936.41 | $34,100.99 |
| Dec. 31, 1960 | 39,501.16 | 40,535.56 |
| Dec. 31, 1961 | 51,297.77 | 53,172.68 |

During the 3 years in issue there were certain transfers from the clearing account to petitioner's general checking account, but during each of such years the total of such transfers was less than the total amount which petitioner declared as income from performances under the contracts plus interest earned on the four savings accounts.

Petitioner was not obligated to refund any moneys collected pursuant to the terms of the contracts but nevertheless it voluntarily refunded the following sums during the years in issue: 1959—$538.09, 1960—$899.85, and 1961—$742.73.

Respondent determined that petitioner's receipts under the contracts for the years in issue were taxable income which it had failed to include in its returns in the respective amounts of: 1959—$6,230.34, 1960—$8,565.00,[2] and 1961—$11,796.61. Respondent further determined that petitioner similarly received and failed to report the amount of $24,705.82[3] during the years 1954 through 1958 and that the tax computed thereon under the provisions of section 481 of the Code became a part of petitioner's income tax deficiency for the year 1959 in accordance with said section 481.

[2] The stipulation indicates that this figure should be $8,564.75.
[3] The stipulation indicates that this figure should be $24,706.07.

OPINION

Respondent's entire argument under the first issue has as its foundation the conclusion that neither form of "Pre-Need Funeral Plan Agreement" employed by petitioner imposed any limitation upon petitioner's right and power to consider and use payments made under the contracts as and for its own property as soon as they were received.

We observe at the outset that in our view there are great and material differences between the form of contract which petitioner employed until September 1961 (referred to hereinafter as the earlier form) and the form of contract used by petitioner after that date (referred to hereinafter as the later form). We shall consider the two forms of contract in chronological order.

On careful analysis of all of the facts of record we are satisfied that until September 1961, when petitioner changed the form of its written contract, it was a true trustee and had not otherwise received, nor had any right to use, the moneys paid in by its pre-need applicants.

The earlier form contract was a written instrument. On its face it created an irrevocable trust in *haec verba* and even dictated the forms of depositories to be used by petitioner for the funds. It provided that a readily ascertainable amount—the interest earned on deposits—be paid to petitioner. We look upon this as the equivalent of a trustee's fee.

It is true that some benefit was bound to flow to petitioner under this arrangement in that it had secured to itself the right to perform applicant's funeral at some time in the future on condition that the applicant had not moved away in the meantime. We observe that corporate trustees of funded irrevocable deferred-payment trusts habitually secure a similar present benefit without being considered to be in receipt of income (or in receipt of anything) in their entity as opposed to their trust character. It is clear, from the facts of the arrangement under the earlier form of contract, that applicants were the true beneficiaries of the trusts which were created. The fact that some incidental and secondary benefit accrued to petitioner is of no moment.

Respondent protests that petitioner had unrestricted control of the funds and unfettered use of them; however, respondent has stipulated that during each of the years in issue, the totals of the transfers to petitioner's general checking account were less than the totals from performances under the contracts plus interest earned on the savings accounts. Of course, this is not conclusive, but it does tend to prove that petitioner did consider itself bound by the express provisions of the earlier form of contract. Of similar import was John L. Hill's action in immediately restoring petitioner's trustee savings accounts to their proper level in 1959 when he discovered that funds had been improperly deposited in petitioner's general account.

Respondent also protests that, under the contracts, and in fact, "There was a complete absence of an independent trustee * * *." If respondent were relying upon unrestricted de facto use of the funds by petitioner for its own purposes this argument would be meaningful, for that would tend to show that as a practical matter there was no trust. But the facts are otherwise as is demonstrated by the stipulation, *supra*, that the "trust" funds were held inviolate.

We have heretofore considered quite similar factual situations in the cases of *Seven-Up Co.*, 14 T.C. 965, acq. 1950–2 C.B. 4; and *Broadcast Measurement Bureau, Inc.*, 16 T.C. 988. In *Seven-Up Co.* the petitioner manufactured and sold 7-Up extract to various franchised bottling companies from which it received a specified sum per gallon of extract to be spent for national advertising of the product. The amounts received were commingled and deposited by petitioner in its regular business checking accounts but it did segregate and earmark such funds on its books. Such a program was obviously of benefit to the manufacturer as well as to the bottlers for in theory the business of each would be increased. Respondent's arguments there, as in the instant case, were that the funds had been received and accrued by the manufacturer in each taxable year under a claim of right and without restriction as to use. Such arguments emphasized the commingling of the funds with manufacturers' business receipts. In sustaining the manufacturer's position we said, page 978:

The commingling of the unexpended portions of the bottlers' contributions in several bank accounts with receipts from petitioner's business did not destroy their identity as trust funds. 54 Am. Jur. 199. Petitioner had on hand at all times cash and securities in excess of the amount of the unexpended funds and its books showed precisely the amounts contributed and unexpended. As custodian of the funds and agent for the bottlers, petitioner was obligated to expend them for national advertising, and any diversion for corporate or other purposes might be enjoined by the bottlers by a suit in equity. See *Portland Cremation Assn.* v. *Commissioner*, 31 Fed. (2d) 843; *Charlton* v. *Chevrolet Motor Co.*, *supra*.

In *Broadcast Measurement Bureau, Inc.*, *supra*, the petitioner engaged in the compilation and distribution of nationwide surveys measuring radio station and network audiences according to a uniform standard. For this purpose it collected subscription fees from individual stations and networks, all of which were not expended during the year of receipt. Respondent's position was the same as it had been in *Seven-Up Co.* and is in the instant case. In sustaining the taxpayer's position we said, page 997:

We are convinced that the subscription fees to Study No. 1 which petitioner received in the fiscal year ended June 30, 1946, were impressed with a trust upon their receipt to expend them solely to meet the costs of Study No. 1 so that they

constituted a trust fund in its hands rather than income. Whether a trust existed with regard to the subscription fees received by BMB in the fiscal year ended June 30, 1946, depends upon the intent of the parties. *No express words of trust were used, but none are necessary. Hibbard, Spencer, Bartlett & Co.,* 5 B.T.A. 464. Close analysis of the subscription contracts entered into between petitioner and subscribing stations and networks, the understanding of the parties with regard to these contracts, and the performance of petitioner in execution of these contracts persuades us that the parties intended that BMB receive the subscription fees in trust for the subscribers to carry out Study No. 1. We find a reasonable certainty as to the property, the objects and the beneficiaries, and in such a situation no particular form of words is necessary to create a trust. *Chicago, Milwaukee & St. Paul Railway Co. v. Des Moines Union Railway Co.,* 254 U.S. 196. [Emphasis supplied.]

Further, in answer to respondent's objection that the funds had never been segregated and that there was therefore no trust res, we said at page 1001:

Petitioner's books showed the total amount of such fees it received and the unexpended balance thereof at all times. Any improper use of the unexpended balance of these fees by their custodian could have been enjoined by the subscribers to Study No. 1 by a suit in equity. *Portland Cremation Association* v. *Commissioner,* 31 F. 2d 843.

The facts of the instant case are more favorable to petitioner than are the facts of either *Seven-Up Co.* or *Broadcast Measurement Bureau, Inc.,* in that Angelus did segregate the funds into a special clearing account and four trustee savings accounts, and, in the instant case, express words of trust were used, which circumstance was not present in *Broadcast Measurement Bureau, Inc.* Also, see and compare *Mutual Tel. Co.* v. *United States,* 204 F. 2d 160 (C.A. 9, 1953).

We conclude from all of the above that petitioner received the payments as they were made under the earlier form of contract as a custodian or trustee with no rights of use as to the funds as such,[4] and consequently that it was not in receipt of income as the payments were made. It follows that in the year 1959 petitioner's taxable income was not computed under a method of accounting any different from the method under which its taxable income for the preceding year had been computed and therefore respondent's determination under section 481 must also fail.

We turn now to the later form of contract which petitioner started using in September 1961 and under which petitioner had the right to, at its option (a) deposit the amounts paid in as theretofore, or (b) "at any time before or after such deposit thereof, use all or any portion of such sums as collateral or payment for (i) the costs of any capital improvement to then existing mortuary facilities belonging to ANGELUS, and (ii) the acquisition and improvement of real property."

---

[4] Petitioner's receipts of interest from the trustee savings accounts were returned as income and such amounts are not in dispute.

It seems quite clear to us that whereas the earlier form of contract created a custodial or trust arrangement, that the above-quoted language from the later form of contract effectively destroys any such possibility as to it, for this language imposes no restraint nor limitation upon petitioner's *right* to use the funds as they are paid in, the only limitation being upon the manner or purpose of such use. We observe further that the permitted purposes (improvement of facilities and acquisition and improvement of land) were both of sole benefit to the petitioner and of no conceivable benefit to the applicants.

It is patent that the title to such improvements and to such land would be in petitioner the same as title to any other of petitioner's properties, and that the values attaching thereto would be properly carried as an asset on petitioner's balance sheets and subject to claims of petitioner's general creditors. Such funds therefore would have lost all character of trust funds and all that remained between petitioner and its applicant would be a unilateral contractual obligation for petitioner to perform, or have performed, the funeral at applicant's death.

Nor do we think the situation is altered by the circumstance that petitioner had not in fact acted under the (b) option above at any time during 1961. Petitioner had the right to do so "at any time before *or after* such deposit," (emphasis supplied) and it is this right to use for its own benefit at any time which effectively prevents the arrangement from being a trust. Trust funds must be impressed with the prescribed duties and obligations when received. It is unimportant that a reserve be set up or that a trust res be later segregated by the recipient of the funds. The mere statement of such a course of action demonstrates that the recipient received such funds with no fetters upon its use of them, and then voluntarily and unilaterally chose to create the reserve or segregate the trust res. Of course, such funds were income to such a recipient when the money was received.

Permitted total invasion of corpus or res by a purported trustee, at any time, and for the sole benefit of such purported trustee (even though it be a restricted form of benefit) is simply another way of saying that something of value has passed to the purported trustee now in return for his unsecured promise to act at a specified time in the future. Such an arrangement is not a trust, and the purported trustee is simply a contracting party. What had been a segregation of the funds under the earlier form of contract became mere window-dressing under the later form of contract.

A comparable situation was dealt with in *Mutual Tel. Co.* v. *United States*, *supra*, where the funds were originally received without any rights of use for that taxpayer's benefit, and therefore such funds were not income to it at that time; but later, under an order of the super-

vising Commission, the taxpayer was given permission to use the funds for one restricted and specified purpose which was of benefit to it. Permission for such use—the establishment of a retirement system for its employees—was properly held to make the funds taxable income to the telephone company at that time.

It seems obvious to us that petitioner's receipts under the later form of contract are subject to the full force of such decisions as *Schlude* v. *Commissioner*, 372 U.S. 128 (1963); *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961); *Automobile Club* v. *Commissioner*, 353 U.S. 180 (1957), and similar cases, and we so hold. Current receipts from the later form of contract were fully taxable to petitioner as they were received.

Since both forms of contract were used by this petitioner in 1961 it is necessary for us to allocate the total 1961 receipts of $11,796.61 between the earlier and the later forms of contract, but unfortunately the petitioner has made no attempt to do so. The record shows only that the changeover occurred in September 1961 but the allocation cannot be made strictly upon the basis of the percentage of time in that year that each form was used because there is no showing of the relative amounts of activity before and after the changeover, and in addition the record does show that during and after September 1961 some undetermined number of the applicants who had already signed the earlier form of contract, elected to and did sign the later form.

In this situation we must simply make the best estimate which we can, bearing heavily against the petitioner because the inexactitude of the record is of its making. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). Consequently, we conclude and hold that one-half of the 1961 receipts were under the earlier form of contract and one-half under the later form.

*Decision will be entered under Rule 50.*