T.C. Memo. 1996-505


UNITED STATES TAX COURT


AFFILIATED FOODS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 25703-93.               Filed November 7, 1996.


<u>William A. Hoy</u>, for petitioner.

<u>George E. Gasper</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax for taxable years 1989 and 1990
of $171,985.68 and $183,196.30, respectively.  The issues for
decision are:  (1) Whether certain payments made by vendors to
petitioner are includable in petitioner's income.  We hold they
are.  (2) Whether cash which petitioner supplied to vendors for

distribution to petitioner's member stores at petitioner's food shows is includable in petitioner's income.  We hold it is.  (3) Whether petitioner is entitled to a deduction under section 162 for certain amounts received from Western Family Foods (Western) and distributed to its member stores at its 1989 and 1990 food shows.  We hold it is.[1]

All subchapter and section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  All dollar amounts are rounded to the nearest dollar.

## FINDINGS OF FACT

Some of the facts have been stipulated.  The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference.  At the time the petition in this case was filed, petitioner's principal place of business was located in Amarillo, Texas.  Petitioner keeps its books and records on the accrual method of accounting, and it files its Federal income tax return using a fiscal year ending September 30.

Petitioner is a wholesale food purchasing cooperative that supplies food and other consumer products to retail grocery

---

[1]     Respondent also determined that petitioner was entitled to an increased environmental tax deduction for 1990.  This is a mathematical adjustment.

stores owned by its shareholders. Petitioner also conducts a small amount of business with stores not owned by shareholders. Petitioner has 210 shareholders, and these shareholders operate approximately 640 retail grocery stores (member stores).[2] For Federal tax purposes, petitioner is a nonexempt cooperative that computes its taxable income under the provisions of Part I of subchapter T (secs. 1381 to 1383, inclusive).

Member stores purchase food and other consumer products from petitioner. Petitioner purchases these goods from more than 2,000 manufacturers and suppliers. Petitioner purchases directly from sales representatives of some manufacturers, such as Proctor & Gamble (P&G) and Colgate-Palmolive (Colgate), and it purchases other manufacturers' products from independent brokers, such as Dejarnett Sales. Brokers typically represented a variety of manufacturers or distributors. Unless otherwise specified, we will use the term "vendor" to refer to manufacturers' sales representatives and brokers.

Petitioner maintains a single bank account with Amarillo National Bank, which it uses as its general operating account (Amarillo account). Petitioner makes all of its deposits into the Amarillo account, and it makes all of its payments from the Amarillo account, including payroll expenditures.

---

[2] Petitioner does not own any interest in any member store.

Promotional Accounts

During the years at issue, manufacturers provided vendors with promotional funds, which were sometimes referred to as "street money". These promotional funds were to be used by the vendors to increase retail sales. Many vendors deposited their promotional funds with petitioner. Petitioner then deposited these funds into its Amarillo account. Petitioner did not maintain separate accounts for the promotional funds; the promotional funds were commingled with its general operating funds.

Although petitioner commingled the promotional funds with its general operating funds, petitioner maintained promotional fund accounting records. Petitioner furnished each vendor with a statement regarding its receipts and disbursements of promotional funds. Petitioner did not charge vendors a fee for maintaining these accounting records. We shall refer to these promotional funds and the associated accounting records as vendor promotional accounts.[3]

---

[3] Although these promotional funds and associated accounting records are variously defined in the record as "record funds", "promotional allowance accounts", etc., we will use the term "promotional accounts". We use this term and any reference to payments, deposits, receipts, or deductions related to the promotional accounts for convenience only. The substantive Federal tax characterization of these accounts and the transactions related to these accounts are legal issues that we address in the Opinion section of this case.

Only P&G and Colgate had written promotional account agreements with petitioner.  The remaining vendors had oral agreements with respect to the promotional accounts.

P&G and Colgate had the following written promotional account agreements with petitioner:  Flexible Marketing Agreement between petitioner and P&G; Cooperative Merchandising Agreement between petitioner and P&G; Category Marketing Agreement between petitioner and P&G; Ajax Line Special Event Merchandising Contract between petitioner and Colgate; and Special Event Merchandising Contract between petitioner and Colgate.  The funds that were the subject of these written promotional account agreements were maintained by petitioner.[4]

Under the Flexible Marketing Agreement (FMA) with P&G, P&G created a promotional account for each category of brand-name products listed in the FMA; e.g., coffee/tea products, chilled beverages, and baking mixes.  The amount paid into the promotional account for each quarter was determined by multiplying a specified rate by the number of cases of the specified brands shipped to petitioner during the "base period".  The base period was the same quarter in the previous year.  The

_____

[4]  The written agreements are inconsistent on whether petitioner or the manufacturer would maintain possession of the promotional funds.  However, the parties have stipulated that petitioner maintained possession of the promotional funds, and the testimony at trial supports the stipulation.

FMA indicated that petitioner could earn promotional funds by: putting a price reduction into effect during the previous 30 days; making a special distribution of cases to retail outlets; or making a special purchase (direct or indirect).

Under the Cooperative Merchandising Agreement (CMA) with P&G, P&G created a promotional account for each brand listed in the agreement; e.g., Ivory bar soap, Top Job, Spic & Span, and Bounce. The amount paid into the promotional account for each quarter was determined by multiplying 34 cents by the number of cases of the specified brands shipped to petitioner during the base period, which was defined as the same quarter during the previous year. Petitioner could use the entire amount in the promotional account, under payment terms set forth in the CMA, for print, broadcast, display, or outdoor billboard advertising. The payment terms varied. For example, if petitioner performed in print media, petitioner would be entitled to "cost plus 50% for advertising overhead expense," or, as an alternative, it could "elect to be paid at the rate of $1.00 per physical case distributed to stores in support of a feature on the Brands in the Merchandiser's best print medium used for any item during the period of the sale." In addition, petitioner was entitled to use up to 20 percent of the promotional account for other activities in the amounts specified in the CMA; for example, petitioner

could be paid reasonable and customary costs for sponsoring an in-store sampling program at one of its shareholder's stores.

Under the Category Marketing Fund Agreement (CMFA) with P&G, P&G created a promotional account for each brand listed in the agreement; e.g, Bold, Dawn, and Downy. The amount paid into the promotional account for each period was determined by multiplying the stated funding rate by the number of cases of the specified brands shipped to petitioner during the base period, with the base period being the same period during the previous year. Petitioner was entitled to payment from the promotional account at a stated rate per case for various advertising and price reduction activities; e.g., print media, broadcast media, and price reduction on sales to retail outlets. Furthermore, P&G authorized payment of petitioner's actual cost of various activities from the promotional account, e.g., petitioner could be paid reasonable and customary costs for sponsoring an in-store sampling program at one of its shareholder's stores.

As indicated, the three written agreements between P&G and petitioner provided that petitioner could withdraw from the promotional accounts certain amounts for performing certain enumerated activities. This was not, however, the entire arrangement between petitioner and P&G's representative, Mr. Davis. Instead, petitioner withdrew funds from the promotional accounts if it performed under the terms of oral agreements it

had with Mr. Davis, whether or not the activities giving rise to payment were covered by the written agreements. Mr. Davis determined how petitioner could use the funds to best promote P&G products, and petitioner decided if it would accept the terms of Mr. Davis' offer.

With respect to advertising activities petitioner could perform to become entitled to withdraw funds from the promotional accounts, Mr. Davis would inform petitioner that he was offering an advertising program to promote certain P&G products and the terms of the offer. After providing the advertising, petitioner would then deduct the moneys to which it was entitled under the terms of Mr. Davis' offer from the P&G promotional accounts. To validate the deduction from the P&G promotional accounts, petitioner provided Mr. Davis with proof of performance, e.g., a copy of an advertisement. Mr. Davis also used promotional account funds to make cash payments to petitioner's member stores at petitioner's annual food show.

Under the Ajax Line Special Event Merchandising Contract and the Special Event Merchandising Contract with Colgate (Colgate agreements), Colgate agreed to create a promotional account for special event promotional services. The promotional account was infused with capital every 6 months, and the amount contributed was based on a fixed price per case of specified products shipped to petitioner during the same period for the prior year. The

moneys in the promotional account could be withdrawn when petitioner rendered special event promotions, such as television or radio advertising.  Colgate agreed to pay petitioner the cost of performance, provided the total payment did not exceed the amount in the fund for the 6-month period.  Furthermore, the Colgate agreements provide that "Monies available for any one promotional period must be earned by the dealer during that period."  In terms of payment, the Colgate agreements provide:

> Payment will be made to the DEALER upon receipt of the Certificate of Performance which must indicate in the "Remarks" section the Jobber's invoice number(s) if invoiced by Jobber; a copy of the applicable short term agreement which indicates the number of cases shipped in support of the COLGATE sponsored short term promotion(s); and documentary proof (script/story/board, tear sheet of rotogravure, and any other appropriate proof of performance as may be required) satisfactory to COLGATE that the "SPECIAL EVENT" performance was rendered as required under the Terms and Conditions of this agreement.  Such payments may not be used to reduce, or as set off against, the sale price of any COLGATE product, nor is any amount claimed to be due hereunder to be deducted by the DEALER from any invoice or bill for COLGATE products.  In no event shall COLGATE have any liability to make payment unless proof of performance is submitted within 30 days after the termination of the performance period.

In contrast to the foregoing, most of the vendors that maintained promotional accounts with petitioner had only oral agreements.  The vendors who had oral promotional account agreements used the promotional funds to pay for product advertising.  They also used the funds to make cash payments to petitioner's member stores at petitioner's annual food show.

Almost all of the promotional accounts had a credit balance at yearend. In fact, petitioner did not use any of the money in several promotional accounts during the years at issue, e.g., Conagra Banquet Food/Pritchard, American Home Food Products, Tropicana, Ragu Foods, Inc., Quaker/Gordon-Murdock, and Gortons of Gloucester/Pritchard.

Mr. Terry Sheldon, a C.P.A., was petitioner's accountant during the years at issue. Around mid-1988, petitioner's management asked Mr. Sheldon to audit petitioner's advertising department, because the department showed a large fluctuation in income. Upon audit, Mr. Sheldon discovered that petitioner had started the promotional accounts sometime during 1988. At that time, petitioner was treating the promotional fund payments as income when received and deducting expenses when incurred. This accounting treatment was applied for both financial reporting purposes and tax purposes. Beginning in 1989, petitioner stopped treating promotional account payments as income on receipt. Rather, petitioner treated promotional account receipts as liabilities to the vendors. Petitioner then reduced the liability to each vendor as it incurred expenses that were paid from the promotional account. Most of the offsetting costs incurred by petitioner were related to advertising costs.

During 1989, petitioner had "art and printing department" expenses of $1,712,656 and income of $1,562,855, resulting in a

loss of $149,801. During 1990, petitioner had "art and printing department" expenses of $1,817,957 and income of $1,810,992, resulting in a loss of $6,965. During 1989, petitioner had "advertising department" expenses of $1,400,535 and income of $966,654, resulting in a loss of $433,881. During 1990, petitioner had "advertising department" expenses of $1,050,053 and income of $918,231, resulting in a loss of $131,822.

In petitioner's accounting records, the income reflected in the art and printing department account and the advertising department account included revenue from the vendor promotional accounts. However, the promotional accounts were not the only source of revenue for these accounts.

Petitioner's art and printing department had a staff of 24 professional artists and printers. They produced printed advertising material for member stores, including full color circulars, handbills, shelf and stack signs, and newspaper layouts. The advertising department provided member stores with advertising and promotional programs, and coordinated a 23-week television campaign during the years at issue. It also planned for grand openings, anniversary sales, and other special events for member stores.

On its financial statements for the years at issue, petitioner reported the unspent promotional account funds as

current liabilities.  At the end of 1989, that total liability was $343,470, and, at the end of 1990, it was $624,880.

The Food Shows

In 1989 and 1990, petitioner conducted its annual food shows in Amarillo, Texas.  These shows were not open to the public. Each vendor entered into an agreement with petitioner governing the vendor's participation in the food show.  The food-show "agreement to participate" generally provided that:  (1) The vendor would pay $450 as a booth and participation fee; (2) the vendor would properly decorate its booth and provide merchandise samples; and (3) the vendor would offer approved special promotions, allowances, and/or special buys on products, with the condition that all offers must be a "real show special". Furthermore, vendors had to agree to submit a recommended list of show sale items to petitioner, which retained the right of approval or rejection on all of the individual items.  Petitioner recovered the expense it incurred in sponsoring the food show through the sale of space.

In preparation for each food show, petitioner asked the participating vendors to complete order forms.  These forms had spaces to identify the vendor, the product being promoted, and the per-unit promotional allowance offered for each product.  The vendors completed the order forms and returned them to

petitioner, and, if approved, the forms were bound into a "food-show book".

Each member store attending the show received a food-show book. Each page related to one vendor, and had a tear-off strip on the right-hand side, which indicated the amount being ordered and the product promotional allowance arising therefrom. Generally, the product promotional allowance was paid in cash at the food show when the order was placed. Not all product allowances, however, were paid in cash.

The cash used by the vendors to make these payments at the food show came from three sources: (1) Promotional accounts; (2) check transactions--a vendor would give petitioner a check, and petitioner would cash the check and provide cash to the vendor at the food show (check transaction); and (3) cash brought to the food show by the vendor.

In connection with the 1989 food show, vendors collectively instructed petitioner to transfer a total of $74,700 in cash to them out of the promotional accounts. In connection with the 1990 food show, vendors collectively instructed petitioner to transfer a total of $112,025 in cash to them out of the promotional accounts.

When funds used by vendors at the food show came from a promotional account or check transaction, the vendors would provide petitioner with written instructions indicating the

amount of cash they wanted and the denominations thereof.  Based upon these written instructions, petitioner obtained cash from the Amarillo National Bank.  Petitioner placed the cash requested by each vendor in a separate bank bag supplied by the Amarillo National Bank.  The bank bags were identified by a number assigned to the individual vendors.  Immediately before the shows began, petitioner made the bank bags available to the vendors at a central location.  Each vendor was required to sign for the bank bag at the time it obtained its requested cash.  At the conclusion of the food shows, the vendors returned to petitioner the bank bags and any unused cash.  Petitioner maintained a record of the amount of cash given to each vendor, the source of that cash, and the amount of any cash returned to petitioner at the conclusion of the food show.

As indicated above, each page in the food-show book had a perforated tear strip.  At the food show, representatives of the member stores placed their merchandise orders on the tear strip and turned them into the vendors.  The vendor made the product promotional payments, then gave the tear slip to petitioner.  Subsequently, petitioner would order the merchandise, deliver it to the member stores, and bill the member stores.  The tear strips had the amount of the product promotional allowance on them.  However, petitioner destroyed these records.

Mr. Davis participated in the 1989 and 1990 food shows on behalf of P&G. He requested a cash disbursement from the P&G promotional account to use at the food show. Then he distributed the cash product promotional allowances at the food show as an incentive to buy P&G food brands. The product promotional allowances available were set forth in the food-show book. The food show sales represented a significant portion of Mr. Davis' annual sales; for example, he sold over 60 percent of his annual volume of Pringle's Potato Chips at the food show. If Mr. Davis did not pass out the entire amount of the cash disbursed to him for the food show, he returned the remainder to petitioner.

Western/Clawson Transactions

Western is a corporation which buys and markets private label products for the grocery industry. It is called a "sourcing company", because it does not produce goods; rather, it contracts with manufacturers to produce the goods it sells under its private label. Petitioner purchases Western's private-label goods. These goods are then shipped from Western to petitioner, and petitioner sells them to its member stores.

Petitioner owns approximately 7 percent of Western's stock. In 1989 and 1990, Western made payments to petitioner of $60,000 and $100,000, respectively. Petitioner did not include the $60,000 and $100,000 distributions in its income, but now

concedes that the payments should have been included in income during 1989 and 1990, respectively.

Petitioner deposited the $60,000 and $100,000 into its Amarillo account in 1989 and 1990, respectively, withdrew cash in the amounts deposited, and gave the cash to Mr. Val Clawson. Mr. Clawson is an employee of Dejarnett Sales, which is a food broker for Western. Mr. Clawson was told to distribute this cash to the member stores at the food shows.

Western does not provide any currency to be passed out at the food show on its behalf. However, using the money given to him by petitioner, Mr. Clawson offered allowances on Western products purchased at the show. For example, if a Western product had a show allowance of a dollar a case and the member store bought 100 cases, then he would give the store $100 cash. He also offered payments by check; the decision on whether to accept currency or a check was made by the member store. Based on the tear strips, the amount of cash given to Mr. Clawson could be reconciled back to the amount of cash that he returned to petitioner at the end of the show. Thus, petitioner knew exactly what was done with the money, how many cases were sold, and the cash allowances distributed at the food show.

According to petitioner's bookkeeping entries, Mr. Clawson distributed $35,616 and $82,958 to representatives of the member stores at the 1989 and 1990 food shows, respectively. Although

records existed at one time showing who received the funds from Mr. Clawson, petitioner destroyed these records.

OPINION

Respondent determined that petitioner had increased advertising and food-show income in 1989 of $343,470 and $162,370, respectively, and increased advertising and food-show income in 1990 of $281,409 and $255,509, respectively.

Issue 1.  Advertising Income

In regard to respondent's 1989 and 1990 advertising income determinations, the $343,470 and the $281,410 represent the balance of the promotional accounts at the end of each year in issue.[5]  By including only the balance of the promotional account in petitioner's income, respondent in effect determined that the promotional account payments constituted gross income and the promotional account disbursements were allowable deductions. Petitioner asserts that it held the promotional account funds as a nontaxable intermediary between the vendors and the member stores, and therefore no amount of the promotional account funds should be includable in its income for either 1989 or 1990.[6]

---

[5]     For 1990, petitioner's yearend balance in the promotional accounts was $624,880; however, in her determination, respondent treated the excess of the yearend balance less the prior yearend balance ($343,470) as taxable income of $281,410.

[6]     Since vendors withdrew $74,700 and $112,025 from the promotional accounts for the 1989 and 1990 food shows,
(continued...)

Petitioner bears the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

Petitioner's contention that it held the promotional account funds as a nontaxable intermediary rests upon a number of decisions of this and other courts. See, e.g., Ford Dealers Advertising Fund, Inc. v. Commissioner, 55 T.C. 761 (1971), affd. per curiam 456 F.2d 255 (5th Cir. 1972); Angelus Funeral Home v. Commissioner, 47 T.C. 391 (1967), affd. 407 F.2d 210 (9th Cir. 1969); Seven-Up Co. v. Commissioner, 14 T.C. 965 (1950).

In Seven-Up Co. v. Commissioner, supra, Seven-Up Co. (7-Up) manufactured and sold extract for a soft drink to various franchised bottlers. Each bottler was granted an exclusive sales territory by 7-Up and controlled its own sales promotion and local advertising within that territory with the aid of 7-Up. Certain bottlers decided that it would be more efficient to conduct promotion and advertising of the beverage on a national level. In order to fund the national advertising campaign, participating bottlers were required to pay 7-Up $17.50 per gallon of extract purchased. The funds were administered by 7-Up and were to be spent solely for advertising purposes. The funds

---

[6](...continued)
respectively, these amounts are not part of the promotional account yearend balances.

were accounted for separately on the company's books, but were not placed in a separate bank account.

In Seven-Up Co., the Commissioner contended that the excess of the amounts received by 7-Up over the advertising expenses incurred and paid constituted taxable income.  In holding that the excess was not taxable, we stated:

> The payments made by the participating bottlers were not for services rendered or to be rendered by petitioner.  Neither were they part of the purchase price of the extract.  They did not, therefore, constitute earnings received by petitioner under a claim of right and without restriction as to disposition, which petitioner would have had to include in its gross income under the rule laid down in North American Oil Consolidated v. Burnet, 286 U.S. 417.  While petitioner had the right to receive the bottlers' contributions under its agreements with them, all the facts and circumstances surrounding the transaction clearly indicate that it was the intention of all of the parties concerned that these contributions were to be used to acquire national advertising for the 7-Up bottled beverage and for that purpose only, and that petitioner was to be a conduit for passing on the funds contributed to the advertising agency which was to arrange for and supply the national advertising. * * * Although the funds were not all expended in the year received, for reasons set forth in our findings, petitioner did expend them for national advertising, did not use them for general corporate purposes, treated the amounts on hand in the fund on its books as a liability to the bottlers, and considered itself, as evidenced by its letter of May 2, 1944, to one of the participating bottlers, merely as a trustee, handling the bottlers' money. [Seven-Up Co. v. Commissioner, 14 T.C. at 977-978.]

In Ford Dealers Advertising Fund, Inc. v. Commissioner, supra, the taxpayer received funds from franchised Ford Dealers in the Jacksonville, Florida, area to be expended for advertising and promotion.  The advertising fund also operated a "car-locator

service" within the territory.  In Ford Dealers, we stated that "when a taxpayer receives trust funds, which he is obligated to expend in entirety for a specified purpose and no profit, gain or other benefit is to be received by him in so doing, the funds are not includable in gross income."  Id.  Focusing on the restricted use of the funds in question, the Court held that such funds were received in trust and did not represent gross income.  Id. at 772.

In contrast, in Krim-Ko Corp. v. Commissioner, 16 T.C. 31 (1951), we found that the amounts received were not restricted as to use or disposition, but rather were paid in consideration for the taxpayer's promise to furnish designated advertising material and services; thus, we held that such amounts constituted gross income to the taxpayer.  Id. at 39-40.  In so holding, we noted that the agreements placed no restrictions upon the use of the funds, nor did they indicate that the recipient was to act "as a depository, conduit, trustee, or agent with respect to * * * [the funds]".  Id. at 39.

To determine whether petitioner was a nontaxable intermediary, we must determine the agreement between the vendors and petitioner.  Ford Dealers Advertising Fund, Inc. v. Commissioner, supra at 771; Seven-Up Co. v. Commissioner, supra at 977.  This is a question of fact to be determined by examining all the facts and circumstances presented.  Angelus Funeral Home

v. Commissioner, 47 T.C. 391, 395 (1967); Seven-Up Co. v. Commissioner, supra at 977.

To establish the terms of the promotional account agreements, petitioner presented several witnesses, including its chairman, two of its officers, two current employees, and a former employee.  Each of these individuals testified that petitioner did not own the promotional account funds.[7]  But none of these individuals clearly articulated the terms of the agreements between the vendors and petitioner with respect to the promotional accounts.  Due to the relationship between petitioner and these individuals and the imprecise nature of their testimony with respect to the promotional account agreements, these witnesses did not aid petitioner in establishing that it was a nontaxable intermediary with respect to the promotional accounts.

In addition to the testimonial evidence, petitioner submitted two written promotional account agreements between petitioner and Colgate.  These agreements indicate that Colgate will reimburse petitioner for its cost of rendering special event promotions, provided petitioner substantiates such expenditures through a "Certificate of Performance" and other supporting documentation.  The Colgate agreements do not, however, indicate that funds from the promotional accounts can be used to make cash

_____

[7]   We note that such testimony appears inconsistent with petitioner's treatment of these accounts on its 1988 books.

disbursements at petitioner's annual food show.  Furthermore, although the Colgate agreements indicate that the promotional funds available for a particular period must be earned during that period, petitioner carried a balance in its Colgate promotional accounts from one period to the next.

Petitioner also submitted three promotional account agreements between petitioner and P&G.  The three written agreements between petitioner and P&G indicate that petitioner can withdraw funds from P&G's promotional accounts for performing certain enumerated activities.  However, petitioner was reimbursed for performing promotional activities that P&G's representative offered to petitioner, even if such activities were not specifically addressed in the agreements.

Both the Colgate and the P&G agreements are helpful in determining the substance of the agreements between petitioner and these two vendors.  However, the facts and circumstances of the case indicate that these agreements did not address the entire arrangement between the parties.  Rather, the facts and circumstances indicate that the vendors could authorize payment from the promotional accounts for promotional activities not addressed by the agreements.  For example, funds were withdrawn from the promotional accounts to make cash payments at petitioner's annual food show, even though the agreements did not specifically address such payments.

Although the overall evidence of the agreements between petitioner and the vendors with respect to the promotional accounts is sparse, particularly with respect to the oral agreements, we believe the best evidence of the substance of such agreements was the agreement with P&G, as there was both written and testimonial evidence concerning that agreement.

Based on all the facts and circumstances, we find that a vendor would inform petitioner that it was offering an advertising program to promote its product. The amount offered for performing was not only petitioner's actual cost, but its cost plus an allowance. Also, if the advertising was done in connection with a product price promotion, the amount offered for advertising was determined by multiplying a specified rate by the volume of the product sold. If petitioner accepted the proposal and performed the advertising, it would deduct the corresponding allowance from the vendor's promotional account and provide the vendor with documentation validating the deduction.

The majority of the withdrawals from the promotional accounts were related advertising promotions. By conducting advertising activity for the vendors, petitioner generated substantial amounts of revenue for its art and printing department and its advertising department. These departments were an important part of petitioner's business, as indicated by petitioner's annual reports.

Although vendors designated a number of advertising activities that petitioner could engage in to make withdrawals from the promotional accounts, petitioner could elect which of those activities to conduct. This fact, coupled with the fact that petitioner rarely, if ever, made refunds of promotional account funds, enabled petitioner to perform only those advertising activities that were profitable. Petitioner could pass on an unfavorable advertising offer and still earn the funds allocated to the promotional accounts on a future date. Essentially, petitioner could carry a balance in a promotional account until it wanted to perform a proposed advertising activity.

The majority of the funds withdrawn from the promotional accounts were treated as art and printing department and advertising department revenue. Petitioner was not merely a conduit with respect to these funds; these funds were substantial revenue for a large scale advertising activity.[8] Petitioner received these payments for materials and services rendered. Petitioner advertised for the vendors, and it was paid for this work. Consequently, these amounts are earnings to petitioner,

---

[8] Petitioner's art and printing department alone had a staff of 24 professional artists and printers. This department had expenditures of almost $2 million a year for 1989 and 1990. Furthermore, petitioner's advertising department had expenditures of over $1 million a year for both 1989 and 1990.

not funds held in trust. Ford Dealers Advertising Fund, Inc. v. Commissioner, 55 T.C. at 773-774; Krim-Ko Corp. v. Commissioner, 16 T.C. at 39-40; Seven-Up Co. v. Commissioner, 14 T.C. at 977-978.

Vendors also offered product price reduction promotions to petitioner, whereby petitioner could withdraw funds from the promotional accounts to pay the member stores if the member stores purchased a specified amount of a given product. These promotions were often associated with the aforementioned advertising promotions. The record is skimpy regarding these product price reduction payments. There is no evidence as to whether the invoices received by the member stores reflected these product allowances, nor how the member stores generally treated them. Furthermore, petitioner has not attempted to substantiate the portion of the promotional accounts' balance that was allocable to these promotions. Overall, the record is inadequate to establish whether these amounts were paid as a rebate, a return of cooperative profits, or some other payment.

Unlike the taxpayers in Seven-Up Co. v. Commissioner, 14 T.C. 965 (1950) and Ford Dealers Advertising Fund, Inc. v. Commissioner, 55 T.C. 761 (1971), petitioner did not act as a mere intermediary, passing the advertising funds along to an advertising agency. Rather, the facts and circumstances surrounding the promotional accounts indicate that the

promotional account funds were to be used by petitioner as payment for advertising materials and services provided by petitioner's art and printing and advertising departments. The promotional account funds are income when received; of course, petitioner will be entitled to claim its advertising expenses as they are incurred. By including only the balance of the promotion accounts in petitioner's income, respondent in effect determined that the promotional fund contributions constituted gross income and the promotional fund disbursements were allowable deductions. Accordingly, we sustain respondent's determination.

Issue 2.  Food-Show Currency

Respondent determined that petitioner's income should be increased by $162,370 and $255,509 for 1989 and 1990, respectively, for the amount of currency distributed by the vendors to the member stores at the 1989 and 1990 food shows from vendor promotional accounts and vendor check transactions. Seven-Up Co. v. Commissioner, supra at 977;[9] petitioner asserts that the cash it delivered to the vendors from the promotional accounts and check transactions at the 1989 and 1990 food shows

---

[9]  Although this determination includes amounts distributed from vendor promotional accounts, these amounts were determined to be included in income only once, as respondent included only the yearend balances in the promotional account (advertising) income determination. See supra note 6.

should not be included in its income.  Petitioner bears the burden of proof on this issue.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).

To resolve this issue, we must examine the taxation of nonexempt cooperatives.  A complete overview of the regime under which nonexempt cooperatives are taxed is set forth in Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547, 554-555 (1994).  Consequently, we shall discuss only those cooperative concepts that are necessary to resolve the issue involved herein.

Cooperatives initially determine gross income without making any adjustments for allocations or distributions made to patrons from net earnings from business with or for patrons.  Sec. 1382(a).  After determining gross income in this manner, section 1382(b) permits cooperatives to compute taxable income by allowing deductions for, inter alia, "patronage dividends", defined in section 1388(a).  Gold Kist Inc. v. Commissioner, 104 T.C. 696, 708 (1995).  A "patronage dividend", generally, is an amount that is allocated or paid to a patron out of the net earnings of the cooperative from business done with or for its patrons and that is based upon the quantity or value of business done with or for the patron, under a preexisting obligation to pay such amount.  Sec. 1388(a); Buckeye Countrymark, Inc. v. Commissioner, supra at 555.

Although patronage dividends are deductible by the cooperative, the patron must include the amount of any patronage dividend in income. Sec. 1385(a)(1). Accordingly, when income from the cooperative's business is distributed as a patronage dividend, the cooperative and its patrons pay only "a single current tax with respect to the income of the cooperative, either at the level of the cooperative or at the level of the patron." S. Rept. 1881, 87th Cong., 2d Sess. 111 (1962), 1962-3 C.B. 707, 822.

However, nonexempt cooperatives, such as petitioner, are taxed like ordinary C corporations on business not conducted with patrons. Gold Kist Inc. v. Commissioner, supra at 708. "Consequently, income from nonpatronage business is taxed to the cooperative, and, if the balance is distributed to patrons, the income is taxed again to the patrons." Id.

Petitioner purchases products from vendors and resells the products to member and nonmember stores. Petitioner profits from its sales. The profit from sales to nonmember stores is allocated to petitioner's retained earnings. However, profit from business conducted with patrons is treated differently.

As a cooperative, petitioner can distribute the profit it earns from patronage business to the shareholders who own the member stores and claim a deduction for this amount. Sec. 1382(b). Thus, income from cooperative activities will be

subject to a single level of tax, assuming the shareholders include the patronage distributions in income. Gold Kist Inc. v. Commissioner, supra at 714. Petitioner purchased products from vendors and Western and resold them to member and nonmember stores for a profit. Ordinarily, petitioner would distribute the patronage income to the shareholders who own member stores and retain the nonpatronage income.

Petitioner asserts that the cash it provided to the vendors at the annual food show from check transactions and promotional accounts should not be included in its income because it held these funds as a nontaxable intermediary. Respondent argues that this cash was income to petitioner, and that the food show cash payments to members were merely part of a scheme to bypass the patronage dividend rules by way of the vendors. To resolve this issue, we must examine the facts and circumstances of the case. Angelus Funeral Home v. Commissioner, 47 T.C. at 395; Seven-Up Co. v. Commissioner, supra at 977;

The economic substance of a transaction, rather than the form in which it is cast, is controlling for Federal income tax purposes; thus, courts may pierce the form of a transaction and tax the substance. Griffiths v. Helvering, 308 U.S. 355, 356-357 (1939); Gregory v. Helvering, 293 U.S. 465, 469 (1935). The underlying philosophy of the "substance over form" doctrine is to prevent taxpayers from attempting to subvert the taxing statutes

by relying upon mere legal formality.  Mississippi Valley
Portland Cement Co. v. United States, 408 F.2d 827, 833 (5th Cir.
1969); Major v. Commissioner, 76 T.C. 239, 246 (1981).

Petitioner claims nontaxable intermediary status, noting
that it had no part in determining the amount of cash vendors
distributed at the food shows.  We disagree.  Petitioner arranged
the food shows and compiled the food show book.  The food-show
book set forth the product price promotions available at the
show.  Vendors submitted their proposed product price promotions
to petitioner, and petitioner determined whether the product
would be included in the show.  There was an incentive to make
the promotions attractive, because the promotions were either
accepted or declined by petitioner; there was no negotiating
after the proposal was submitted.  The control petitioner
maintained over which products would be available at the show,
combined with the vendors' need to sell at the food show, ensured
that the product price promotion would be economically
attractive.  Thus, petitioner played a significant role in
determining the promotional allowances provided at the food
shows.

With respect to the check transactions, petitioner claims it
merely provided a check-cashing service, receiving vendors'
checks, cashing the checks, and returning the checks to the
vendors.  We disagree.  Vendors made the checks payable to

petitioner. Petitioner cashed these checks at its bank, and it returned the cash to the vendors for distribution to the member stores at the food show. Petitioner also provided the vendors with cash from the promotional accounts. In both instances, petitioner required the vendors to sign for the cash received, and, most importantly, it also required any unused cash to be returned to it at the end of the food show. This was not a check-cashing service. Unlike a check-cashing service, petitioner ensured that the check proceeds were either paid to its shareholders or returned to it.

Through the food-show book tear strips, petitioner knew the exact amount of product price promotion distributed at the show, as the tear strips indicated the product sold and the product price promotion given by the vendor. Petitioner destroyed these records.

Petitioner concedes that the $60,000 and the $100,000 checks it received from Western are gross income. Petitioner converted these Western checks into cash and gave the cash to Mr. Clawson to distribute to the member stores at the food show. Although petitioner kept records showing who received funds from Mr. Clawson, petitioner destroyed these records.

Mr. Clawson distributed the Western cash in the same manner that the other vendors distributed their food-show cash--he provided product promotion cash allowances. For example, if a

Western product had a show allowance of a dollar a case, and the member store bought 100 cases, then he would give the member store $100.

Petitioner's actions with respect to the Western money reveal the substance of the food-show cash disbursements. Petitioner was distributing its money to its member stores, and hence its shareholders, and the distributions were based on the amount of product purchased, or business done, by the shareholder. This is the essence of a patronage dividend. However, rather than treat these distributions as patronage dividends, where deductibility would be conditioned on the distributions' meeting certain statutory requirements, petitioner merely excluded the amounts from income, achieving the same tax effect as a patronage dividend (provided the shareholders included the cash in their income). Moreover, the use of cash and destruction of records invite suspicion that there was no intent that the income be reported on any level.

The vendors, not petitioner, were conduits with respect to the food show cash transactions. Petitioner was not a nontaxable intermediary with respect to the food show cash disbursements arising from the promotional accounts. Ford Dealers Advertising Fund, Inc. v. Commissioner, 55 T.C. 761 (1971). Similarly, as for the food show cash disbursements arising from the check-cashing transactions, petitioner exercised dominion and control

over these funds, as evidenced by the return of any "unused" cash. Thus, these amounts must also be included in petitioner's income. See, e.g., <u>North Am. Oil Consol. v. Burnet</u>, 286 U.S. 417, 424 (1932); <u>Ford Dealers Advertising Fund, Inc. v. Commissioner</u>, <u>supra</u>; <u>Latimer v. Commissioner</u>, 55 T.C. 515, 520 (1970).[10] Accordingly, we sustain respondent's determination.

Issue 3. Section 162 Deduction

Petitioner argues that, if the amounts distributed to the shareholders at the 1989 and 1990 food shows from the promotional accounts and check-cashing transactions are includable in its income, the difference between the funds received from Western, which petitioner concedes are income, and those returned by Mr. Clawson at the end of the respective food shows are deductible business expenses incurred by petitioner. Petitioner asserts that these amounts were paid for the purpose of promoting the success of the food shows, and therefore are deductible under section 162. Respondent argues that such a deduction is not allowable. Petitioner bears the burden of proof on this issue. Rule 142(a); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992).

---

[10] Petitioner cannot substantiate a patronage dividend deduction for the amounts distributed at the food show, because it has destroyed the records that documented the products purchased, the payments made, and the shareholders who received the payments. Sec. 1388.

In pertinent part, section 162(a) provides:  "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  To qualify for deduction under section 162(a), an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense.  INDOPCO, Inc. v. Commissioner, supra at 85.

Mr. Clawson received $60,000 and $100,000 from petitioner to distribute on petitioner's behalf at the 1989 and 1990 food shows, respectively.  Petitioner provided bookkeeping entries that indicate that Mr. Clawson distributed $35,616 and $82,958 to representatives of the member stores at the 1989 and 1990 food shows, respectively.  In addition, Mr. Clawson testified that he distributed such money to the shareholders of the member stores.  Mr. Clawson indicated that he made the cash payments to encourage petitioner's shareholders to purchase Western products from petitioner.  We hold that petitioner has substantiated its entitlement to a deduction for the amounts distributed by Mr. Clawson at the 1989 and 1990 food shows.  Associated Milk Producers, Inc. v. Commissioner, 68 T.C. 729 (1977); sec. 1.162-1(a), Income Tax Regs.[11]

---

[11]     On brief petitioner did not argue that food show cash
(continued...)

Since we sustained respondent's income determination with respect to the promotional accounts and the food show disbursements, we do not need to address her remaining argument.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[11](...continued)
payments made by vendors other than Mr. Clawson were deductible; accordingly, petitioner has conceded this issue. <u>Cluck v. Commissioner</u>, 105 T.C. 324, 325 n.1 (1995); <u>Money v. Commissioner</u>, 89 T.C. 46, 48 (1987). In any event, we would find that petitioner has not substantiated its entitlement to such a deduction, because it destroyed the records associated with such disbursements and provided no other credible evidence demonstrating its entitlement to deduct such amounts. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs.