*Decision will be entered under Rule 50.*

FORD DEALERS ADVERTISING FUND, INC., JACKSONVILLE DIVISION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2595–69. Filed February 22, 1971.

*William R. Frazier*, for the petitioner.
*Vernon J. Owens*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in petitioner's Federal income tax for the taxable years ending January 31, 1966, and January 31, 1967, in the amounts of $97,514.85 and $83,150.54, respectively.

Concessions having been made, the only issue remaining for decision is whether funds received by the Ford Dealers Advertising Fund, Inc., from its members and Ford Motor Co. are includable in "gross income."

#### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and exhibits attached thereto are incorporated herein by this reference.

Petitioner herein is the Ford Dealers Advertising Fund, Inc., Jacksonville Division (hereinafter sometimes referred to as Advertising), whose principal place of business was located in Jacksonville, Fla., at the time the petition in the instant case was filed. Advertising filed its corporate income tax returns for the fiscal years ending January 31, 1966, and January 31, 1967, with the district director of internal revenue, Jacksonville, Fla. Its books were kept and its corporate returns filed on the cash receipts and disbursement method of accounting with a fiscal year ending January 31.

According to Advertising's charter as amended on February 7, 1951, the purposes and limitation upon its activities are:

### II.

The general nature, object and purpose of this corporation shall be to promote social and educational intercourse between its members, to exchange ideas and methods in respect to the promotion of the sales of their products through advertising of various kinds and through various mediums, and to unify and standardize their efforts and aims along said lines so as to promote harmony and to make the same more productive and effective.

### II. (b)

To improve business conditions in the general area comprised of the State of Florida and the Southern part of Georgia with respect to the sale in that area of passenger cars, commercial cars, and/or trucks and automobile equipment handled by members of the Corporation, whether new or used, to promote good will and acceptance for such cars, trucks, and automotive equipment, and to promote the common business interest of the members of the Corporation with respect thereto, by group advertising and other legitimate means and methods deemed desirable.

The Corporation shall not engage in any business of a kind ordinarily carried on for profit, and nothing in these Articles of Incorporation or in the By-Laws shall authorize the Corporation to, and the Corporation shall not enter into any transaction, carry on any activity, or engage in any business for pecuniary profit, and any income received by the Corporation shall be applied exclusively to the not-for-profit purposes and objects of the Corporation as set forth herein, and no part thereof shall inure to the benefit of any private member or individual.

The bylaws, as amended January 13, 1966, further enumerate the purposes to be:

1. To promote sales of Ford cars, trucks, parts and accessories, used cars and trucks, and automobile maintenance and repair services offered to car and truck owners and users in territories served by the dealer members of the Fund, through the medium of various types of advertising promotions and services purchased and paid for locally by the Fund from monies contributed voluntarily thereto for that purpose, by the members.

2. To retain the services of competent advertising counsel to advise and to assist in the planning, designing, preparation and execution of appropriate advertising campaigns and material.

3. To collect the voluntary advertising contributions of the respective dealer members of the Fund to be used for the purchase of an advertising counsel and materials and services as contracted for with all types of advertising media, and for all expenses incident thereto, including the cost of maintaining records and administering the funds.

4. To elect a committee consisting of authorized dealer members to act on behalf of all members of the Fund in the planning and execution of advertising activities, including those recommended or suggested by advertising counsel, receive the voluntary contributions of dealer members and to expend such monies for appropriate advertising purposes and expenses incident thereto, and to make available to all members an adequate accounting of Fund receipts.

5. The Ford Dealers Advertising Fund is definitely not intended to take over any dealer's individual advertising, but rather is intended to increase his own advertising by the use of media and rates to which the dealer does not have access, or by increasing the amount of advertising appearing in each dealer point through the use of any accepted medium. In other words, this Plan makes it possible for dealers to do collectively what they could not or would not do individually.

As provided in its charter, Advertising's affairs and business were to be conducted and managed by a board of directors (hereinafter sometimes referred to as the board), which might not be comprised of less than nine members; by a president, vice president, secretary, treasurer; and by other officers, agents, and employees as the board should authorize. During the years in issue the officers were a president and a secretary-treasurer and the board consisted of 24 directors elected by the members. The board's powers, under Articles V and VIII of the bylaws, were as follows:

ARTICLE V

POWERS OF THE DIRECTORS

The Directors in addition to the powers conferred by law and the Articles of Incorporation, shall have the power:

(a) To appoint and remove at pleasure all agents and employees of the Fund and prescribe their duties, fix their compensation and require from them security for faithful service.

(b) To conduct, manage and control the affairs, policies, and business of the corporation; to make rules and regulations not inconsistent with laws of the State of Florida or these By-Laws, for the guidance of the officers and management of the affairs of the Fund.

(c) To do any and all things that may be necessary and expedient for the welfare of the Fund.

\*　　　·\*　　　\*　　　\*　　　\*　　　\*　　　\*

ARTICLE VIII

RIGHTS OF OWNERSHIP OF MEMBERS

All money received by the Fund shall be used and administered for the benefit of the Fund and of its members in such manner as the Board of Directors may from time to time determine.

During the years in issue, H. O. Harris (hereinafter sometimes referred to as Harris) was employed as Advertising's executive director. He supervised the administration of cash receipts, maintenance of records, and all day-to-day functions engaged in by Advertising. A secretary-bookkeeper and two other full-time office personnel were also employed by Advertising. Except for these four individuals, no other person received any compensation for his services to Advertising as such. Officers and directors did, however, receive reimbursement for traveling expenses for attending board and committee meetings.

Membership in Advertising was restricted to dealers who held franchises for the sale of Ford Motor Co. (hereinafter sometimes referred to as Ford) automobiles and trucks in Ford's Jacksonville sales district. At the time a dealer became a member he signed an authorization for Ford to add to his invoices $13 for each Ford automobile and truck and $28 for each Thunderbird delivered to him. These funds were forwarded by Ford to Advertising. The dealer also executed the "Jacksonville District Ford Dealers Advertising Fund, Inc., Dealer Agreement," which provided:

### JACKSONVILLE DISTRICT

### FORD DEALERS ADVERTISING FUND, INC.

#### DEALER AGREEMENT

WHEREAS, the undersigned, a dealer in automotive products and services, is an authorized dealer in the products and services of the Ford Motor Company in the Jacksonville district territory and is one of the dealer-members of the Ford Dealers Advertising Fund, Inc., Jacksonville District (hereinafter referred to as the Fund), a not-for-profit corporation organized under the laws of the State of Florida ; and

WHEREAS, each of said dealer-members has heretofore remitted specified sums of money to said Fund, or desires so to remit specified sums of money thereto, on condition that the Fund select and contract for advertising and promoting the automotive products and services sold by said dealers and expended the remittances in payment for such advertising, promotion and other not-for-profit purposes of the Fund ; and

WHEREAS, it was and is the intent of each dealer to obligate the Fund to expend all of the dealers' remittances in their entirety for purposes related solely to advertising and promoting the automotive products and services of the members,

Now, THEREFORE, the dealers in the Fund, and said Fund, hereby mutually declare, agree and covenant with one another—

1. That all remittances heretofore or hereafter made by the dealers to the Fund shall be expended in their entirety for the not-for-profit purposes of the Fund in advertising and promoting the automotive products and services of the members, and necessary corporate expense incident thereto ;

2. That in the event of dissolution of the Fund, all unexpended remittances shall be disbursed in their entirety by the Fund for the not-for-profit purposes set forth in the preceding paragraph 1 hereof ;

3. That the Fund is obligated to expend all remittances received from the dealers in the manner described above as a condition of the payment thereof by the dealers;

4. That this agreement (which supersedes any similar or other agreement heretofore in effect between the parties) may be executed in any number of counterparts, each of which shall be taken and deemed to be an original, and all together but one instrument.

Executed this _____ day of _____, 19_____.

Witness:                                        Company Name _____
                                                                              Dealer

_____        By: _____
                                                                  Title

_____        _____
                                                                  City            State

_____        Ford Dealers Advertising Fund, Inc.

_____        By: _____

In certain cases, Advertising refunded to a dealer the $13 he had paid per car. This occurred when cars were sold in fleet sales, i.e., sales to governmental units or agencies and to owners of five or more vehicles. Such sales were usually highly competitive and made at small margins of profits. Since the $13 per unit for a fleet-sale car frequently made the difference between losing or making a sale, the members decided that the amount per car should not be used for advertising but remitted to them. During the fiscal year ended January 31, 1966, Advertising made total fleet refunds of $237,861. For the fiscal year ended January 31, 1967, total fleet refunds were made in the amount of $250,640.

Aside from the above source of income Advertising periodically received contributions from Ford. For the year ended January 31, 1966, no contributions were made; however, in the fiscal year ended January 31, 1967, Advertising received $136,410 from Ford and other contributions have been received since that time. There was no contractual obligation for Ford to give these funds and Ford placed no limitations as to the type of advertising on which the funds were to be expended.

During the years in issue, Advertising also received interest on an emergency reserve fund held in the form of certificates of deposit, which by the end of the fiscal year ending January 31, 1967, totaled $100,000. The fund was created so that if Advertising's receipts from Ford, based on the per unit charges, were curtailed, as for example in the event of a strike, its cash balances would not be unduly depleted.

In such instances, the reserve was to be available to meet obligations on an emergency basis.

The reserve fund was authorized by the directors in early 1965, and was created by transferring specified amounts of money per month. On January 31, 1966, the reserve had a balance of $70,000 and the full $100,000 was in reserve by the end of the next fiscal year. The certificates of deposit bore interest in the amount of $246 in the fiscal year ending January 31, 1966, and $3,240 in the fiscal year ending January 31, 1967.

No use of the fund was made during the years involved herein although during the Ford strike in 1967, the directors did cash in a $10,000 certificate of deposit to provide funds to meet an outdoor advertising bill which they anticipated.

Advertising expends its funds on various advertising campaigns, sales promotion schemes, commissions paid to an advertising agency, J. Walter Thompson Co. (hereinafter sometimes refered to as Thompson), salaries to its executive director and office personnel, miscellaneous administrative expenses, the above-mentioned "fleet sale refunds," and a car-locator service.

The car-locator service involved the contacting of various dealers within the territory to locate cars equipped with specific optional accessories that other dealers in the territory desire. If a dealer had a customer who wanted a car with specific equipment which he did not have, the dealer would contact Advertising's car-locator personnel who in turn would try to locate the desired car with another dealer and ascertain whether that dealer would release the unit. If the unit would be released, the dealer desiring the car was so advised. Ford furnished Advertising with a weekly inventory list of all new cars and trucks shipped to its dealers in the territory to be utilized in these operations.

Prior to December 1, 1964, petitioner had contracted with a firm to furnish this locator service at an annual cost of approximately $24,180. The contract was canceled on the above date and the service was operated by it thereafter at a charge of $2.50 for each car located. The fee was increased to $3 during the 1968 fiscal year. During the fiscal years ending January 31, 1966 and 1967, Advertising expended, respectively, $4,701.67 and $6,109.64 more on the car-locator service than it received from the dealers for the units located.

During the fiscal year ending January 31, 1966, Advertising also conducted a salesmen incentive program. This program was approved by the board on April 22, 1965. It involved the purchase and presentation of U.S. savings bonds of $18.75 denomination to qualifying salesmen of various dealers, with Advertising paying $10 per unit

and the dealer $8.75. Advertising authorized $50,000 for the program and actually expended $45,827.91 during the fiscal year. Again during the fiscal year ended January 31, 1969, it expended $44,587.50 on the program.

Advertising's primary activity involved execution of advertising campaigns. All advertising done in the sales-promotion campaign was developed by representatives and employees of Thompson, which made the contracts with various news media and did all the work preparing the advertising copy and planning the promotion activity. Prior to Advertising's opening of its Jacksonville office on December 1, 1964, Thompson not only placed all advertising for it, but also maintained its books and other accounting records; however, after Advertising opened its Jacksonville office it began keeping its own books and records.

Thompson had representatives at each meeting of petitioner's advertising committee, which consisted of the board. At such times Thompson presented material to the committee that it had developed and thought advisable. Usually four or five different selections were presented for the board's consideration. The board also decided upon the total amount to be expended on the campaign, and the periods over which the campaign was to extend. Thereafter the executive director determined a budget for each dealer and gave it to Thompson, which in turn placed the advertising.

On some occasions, dealers made their own contracts with the media. This was done because dealers frequently could obtain a lower local rate than the national rate for which Thompson contracted. In such instances, dealers would place the advertising material which had been prepared by Thompson and would remit proof and records to Advertising for reimbursement. When individual dealers placed their own advertising, they had to comply with the prescribed theme, or forgo reimbursement. In such a case, the funds allocated to him are carried over until the next campaign.

Within the organization of Advertising, there was created sometime during 1959, a Miami, Fla., subcommittee that consisted of the Ford dealers in the Miami area. This committee operated independently with respect to advertising campaigns for the Miami area; however, it operated under the general supervision and administration of the petitioner's officers and executive director in Jacksonville. The marketing conditions in the Miami area differed from those in other parts of the State, necessitating this type of operation. The Jacksonville office maintained the books and records and a separate bank account for the Miami subcommittee. The Jacksonville office also disbursed all of the funds on behalf of the committee to Thompson just as it did for all of the other dealers.

A statement of receipts and disbursements for Advertising for the fiscal year ending January 31, 1966, is as follows:

|  | Jacksonville FDAF | Miami subcommittee | Total |
|---|---|---|---|
| Cash balance Feb. 1, 1965 | $22,618.64 | $22,896.56 | $45,515.20 |
| Vehicle income December 1964 thru November 1965 and other receipts | 980,841.73 | 360,336.62 | 1,341,178.35 |
| Total | 1,003,460.37 | 383,233.18 | 1,386,693.55 |
| Less car-locator receipts February thru January 1966 credited to this expense | 6,490.00 | | 6,490.00 |
| Total funds available as of Jan. 31, 1966 | 996,970.37 | 383,233.18 | 1,380,203.55 |
| Less media disbursements: | | | |
| Newspaper | 194,982.25 | 65,797.30 | 260,779.55 |
| Radio | 126,606.45 | 40,797.26 | 167,403.71 |
| Television | 26,194.12 | 38,381.92 | 64,576.04 |
| Outdoor | 214,543.65 | 5,487.24 | 220,030.89 |
| Direct mail | | | |
| Direct mail (T-Bird owner loyalty program) | 34,395.00 | | 34,395.00 |
| Sales promotion | | 40,240.84 | 40,240.84 |
| Incentives | 41,457.91 | 4,370.00 | 45,827.91 |
| Total media disbursements | 638,179.38 | 195,074.56 | 833,253.94 |
| Less general and administrative disbursements: | | | |
| Furniture and equipment | 3,561.87 | 716.54 | 4,278.41 |
| Fleet refunds | 138,827.00 | 99,034.00 | 237,861.00 |
| Committee members travel | 15,842.07 | | 15,842.07 |
| Meeting expense | 1,368.31 | 576.57 | 1,944.88 |
| General office expense | 13,929.13 | 8,606.55 | 22,535.68 |
| Auditing and legal fees | 775.00 | | 775.00 |
| Car-locator service | 4,701.67 | | 4,701.67 |
| Total general and administrative disbursements | 179,005.05 | 108,933.66 | 287,938.71 |
| Total disbursements | 817,184.43 | 304,008.22 | 1,121,192.65 |
| Cash balance Jan. 31, 1966 | [1] 179,785.94 | 79,224.96 | 259,010.90 |
| Memo: Accounts receivable car-locator service January 1966 | 810.00 | | |

[1] Includes $70,000 on deposit in reserve account at 4½% interest.

Its balance sheet for that fiscal year states:

### ASSETS

*Current assets*

Cash in banks:

| | | |
|---|---|---|
| Jacksonville district-wide | $179,785.94 | |
| Miami subcommittee | 79,224.96 | $259,010.90 |

Accounts receivable:

| | |
|---|---|
| Car-locator service | 810.00 |
| Total current assets | 259,820.90 |

| *Fixed assets* | *Cost* | *Accumulated depreciation* | *Cost less accumulated depreciation* |
|---|---|---|---|
| Office equipment and furnishings | $4,746.79 | $464.99 | $4,281.80 |
| Automobile | 3,356.31 | 83.91 | 3,272.40 |
| | 8,103.10 | 548.90 | 7,554.20 |

| | |
|---|---|
| Fixed assets—net | 7,554.20 |
| Total assets | 267,375.10 |

LIABILITIES AND MEMBERS' EQUITY IN THE FUND

| | | |
|---|---:|---:|
| Payroll taxes payable | | $371. 00 |
| Reserve accounts: | | |
| District-wide | $182, 409. 14 | |
| Miami subcommittee | 79, 224. 96 | |
| Thunderbird loyalty program | 5, 370. 00 | 267, 004. 10 |
| Total liabilities and members' equity | | 267, 375. 10 |

For the fiscal year ending January 31, 1967, Advertising's receipts and disbursements were:

| | Jacksonville FDAF | Miami sub-committee | Total |
|---|---:|---:|---:|
| Cash balance Feb. 1, 1966 | $179, 785. 94 | $79, 224. 96 | $259, 010. 90 |
| Vehicle income December 1965 thru November 1966 and other receipts February 1966 thru January 1967 | 1 1, 135, 355. 07 | 1 407, 412. 00 | 1 1, 542, 767. 07 |
| Total | 1, 315, 141. 01 | 486, 636. 96 | 1, 801, 777. 97 |
| Less car-locator receipts which were credited to expense | 8, 167. 50 | | 8, 167. 50 |
| Total funds available during fiscal year | 1, 306, 973. 51 | 486, 636. 96 | 1, 793, 610. 47 |
| Media disbursements | 878, 803. 07 | 302, 292. 13 | 1, 181, 095. 20 |
| General and administrative disbursements | 178, 685. 30 | 116, 448. 75 | 295, 134. 05 |
| Total disbursements | 1, 057, 488. 37 | 418, 740. 88 | 1, 476, 229. 25 |
| Cash balance Jan. 31, 1967 | 2 249, 485. 14 | 67, 896. 08 | 317, 381. 22 |

1 Receipts include following contribution from Ford Division:
Jacksonville FDAF _____ $112, 108
Miami subcommittee _____ 24, 302
                                                        136, 410

2 Includes $100,000—certificates of deposit.

Its balance sheet for that year was as follows:

ASSETS

*Current assets*

| | | |
|---|---:|---:|
| Cash in banks (Note 1): | | |
| District-wide | $377, 533. 14 | |
| Miami subcommittee | 67, 896. 08 | $445, 429. 22 |
| Accounts receivable—car-locator service | | 1, 002. 50 |
| Total current assets | | 446, 431. 72 |

| *Fixed assets* | Cost | *Accumulated depreciation* | *Cost less depreciation* | |
|---|---:|---:|---:|---:|
| Office equipment and furnishings | $4, 960. 40 | $950. 35 | $4, 010. 05 | |
| Automobile | 3, 866. 55 | 90. 00 | 3, 776. 55 | |
| | 8, 826. 95 | 1, 040. 35 | | 7, 786. 60 |
| Total assets | | | | 454, 218. 32 |

LIABILITIES AND MEMBERS' EQUITY IN THE FUND

| | | |
|---|---:|---:|
| Payroll taxes payable | | $1, 033. 48 |
| Deferred vehicle income (Note 1) | | 128, 048. 00 |
| Reserve accounts: | | |
|     District-wide | $242, 525. 76 | |
|     Miami subcommittee | 67, 896. 08 | |
|     Thunderbird loyalty program | 14, 715. 00 | 325, 136. 84 |
|       Total liabilities and member's equity | | 454, 218. 32 |

*Note 1.*—There is normally a 2-month delay in receiving vehicle income from the factory. Prior to the end of January 1967 vehicle income for December 1966 deliveries was received in the amount of $128,048 and deposit was not delayed until the following month as usual. On Feb. 7, 1967, $36,361 was transferred to the Miami subcommittee. This is shown in the balance sheet as Deferred Vehicle Income, and will be transferred to earned income in February 1967. Inclusion of this amount in income for January 1967 would have resulted in 13 months of vehicle income for the fiscal year.

In its corporate income tax return for fiscal year ended January 31, 1966, Advertising reported a surplus reserve as of January 31, 1965, of $49,346, to which was added the amount of $216,848 as "Excess of Trust Receipts Over Expenditures during the Year." The return for fiscal year ended January 31, 1967, showed the balance of surplus reserve on hand January 31, 1966, at $266,194, to which was added the "Excess of Trust Receipts Over Expenditures during the Year" of $58,943, leaving a balance denominated as being held in trust for future expenditures by dealers of $325,137.

Respondent, in his notice of deficiency, determined that the excess of receipts over expenditures each year was taxable income. He also determined that in the fiscal year ending January 31, 1967, the $128,048 received from Ford as vehicle income and listed as "Deferred Vehicle Income (Note 1)" on the balance sheet for that year should be includable in income in that fiscal year.

OPINION

Petitioner received sums of money from both its member-dealers and Ford. It contends that these receipts were held in trust, since it served merely as a conduit or agent for forwarding them to the advertising media; and hence, that the receipts were not includable in "gross income."[1] Respondent, on the other hand, argues that Advertising was nothing more than a corporation engaging in general business purposes. According to him the funds were subject to general disbursements with few restrictions placed upon them; hence, they were not held in trust, and their receipt falls within the broad sweep of the term "gross income" under section 61.

---

[1] On brief, petitioner conceded that it was taxable on the interest received on the certificates of deposit and also on any difference of receipts over expenditures for the car-locator service.

Both parties agree that the decision in this case depends upon the applicability of our prior decisions in *Seven-Up Co.*, 14 T.C. 965 (1950); *Broadcast Measurement Bureau, Inc.*, 16 T.C. 988 (1951); *Angelus Funeral Home*, 47 T.C. 391 (1967), affd. 407 F.2d 210 (C.A. 9, 1969); and *Dri-Powr Distributors Association Trust*, 54 T.C. 460 (1970). These cases have held, within the context of their factual situations, that when a taxpayer receives trust funds, which he is obligated to expend in entirety for a specified purpose and no profit, gain, or other benefit is to be received by him in so doing, the funds are not includable in gross income.

Petitioner argues that the factual situations in the above cases are analogous to his and the principles therein enunciated are applicable. Respondent, on the other hand, attempts to distinguish these cases on the grounds that the funds received by Advertising were not so restricted in their use. He argues further that the discretion held by Advertising's board over their use was materially greater than was the case in our prior decisions. Moreover, he argues that the funds were not required to be fully expended in the year of receipt, and Advertising conducted other extraneous, "business-like" activities such as the car-locator service and the sales incentive program.

In *Seven-Up Co., supra*, the taxpayer manufactured 7-Up extract which it sold to various franchised bottling companies (hereinafter sometimes referred to as bottlers). These bottlers manufactured the soft drink known as 7-Up and sold the finished product in exclusive territories allotted to each of them by Seven-Up Co. Promotion and local advertising were independently undertaken by the bottlers, since Seven-Up Co. did not do advertising for its product.

In order to undertake a program of national advertising, each bottler decided and agreed to pay an extra specified sum per gallon of extract to Seven-Up Co. at the time of purchase to finance a national advertising campaign. The funds were to be administered by Seven-Up Co. and utilized solely for "advertising purposes." They were not placed in a separate bank account, but were kept separate on its books.

Before advertising was selected and placed, the details were discussed with officers of the Seven-Up Co. by an advertising agency which handled the national campaign. At the end of the years there in issue, receipts exceeded expenditures. In holding that the excess was not taxable as gross income, we stated (14 T.C. at 977–978):

The payments made by the participating bottlers were not for services rendered or to be rendered by petitioner. Neither were they part of the purchase price of the extract. They did not, therefore, constitute *earnings* received by petitioner under a claim of right and without restriction as to disposition, which petitioner would have had to include in its gross income under the rule laid down in *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417. While petitioner had the

right to receive the bottlers' contributions under its agreements with them, all the facts and circumstances surrounding the transaction clearly indicate that it was the intention of all of the parties concerned that these contributions were to be used to acquire national advertising for the 7-Up bottled beverage and for that purpose only, and that petitioner was to be a conduit for passing on the funds contributed to the advertising agency which was to arrange for and supply the national advertising. Cf. *Central Life Assurance Society, Mutual* v. *Commissioner*, 51 Fed. (2d) 939. Although the funds were not all expended in the year received, for reasons set forth in our findings, petitioner did expend them for national advertising, did not use them for general corporate purposes, treated the amounts on hand in the fund on its books as a liability to the bottlers, and considered itself, as evidenced by its letter of May 2, 1944, to one of the participating bottlers, merely as a trustee, handling the bottlers' money.

We think the same rationale applies here. Use of the funds received from the dealers via Ford was restricted according to the agreement entered into between Advertising and the dealers. The money was to be utilized solely for "the not-for-profit purposes of the Fund in advertising and promoting the automotive products and services of the members, and necessary corporate expenses incident thereto." Any funds left upon Advertising's dissolution, likewise, had to be so utilized for the same purpose. Under the agreement, it is clear that the funds received could not benefit Advertising as an entity by way of any profit or gain it could derive from the "services" performed during its existence, since it was to receive no compensation for handling the funds. Nor could Advertising benefit upon termination, since the funds had to be expended entirely for the enumerated purposes before its termination. The bylaws and charter reinforce the above conclusions with respect to both the extent to which petitioner was to benefit from receipt of the funds and the limitations which were imposed upon their use.

Similarly, the receipts from Ford were to be utilized for "advertising." In this regard, Harris stated at trial that "of course, it [the Ford funds] is to be used for advertising." He also indicated that Ford placed no restrictions on the type of advertising for which the money was to be expended or on the time within which the funds had to be utilized. Nevertheless, these funds were to be utilized for advertising only and the charter and bylaws of the corporation restricted their use as well.

Respondent has made much of his contention that the powers of the board and the purposes for which Advertising might use funds under its charter and bylaws are broader and more discretionary than in the cited cases. In fact, however, the certificate of incorporation in *Broadcast Measurement Bureau, Inc., supra*, setting up the nonprofit membership corporation there, was just as broad and did not result in the

funds being includable in "gross income." That certificate stated (16 T.C. at 989) :

To foster, promote and conduct research and investigations to establish measurements of broadcasting of all types; to develop standards for the measurement and evaluation of broadcasting audiences of all types; to establish and supervise practices in connection with the collection, tabulation, evaluation, and authentication of audience data with respect to the entire broadcasting industry; to prepare and issue statements and reports of audience data of the broadcasting industry and to perform other acts and services which will further the mutual interests of advertisers, advertising agencies and the broadcasting industry in the accurate and scientific evaluation of the broadcast advertising medium.

While there is broad discretion in the instant case, nevertheless, the funds had to be utilized for very specified purposes. The powers of the board are, moreover, fiduciary in nature and we can see no more discretion here than is often found in the ordinary trust arrangement.

We find and hold that a trust existed as to the funds received from both Ford independently and from the dealers via Ford. In this regard, *Broadcast Measurement Bureau, Inc., supra*, is especially in point. In that case, the petitioner collected subscription fees for the express purpose of the compilation and distribution of nation-wide surveys measuring radio station and network audiences according to a uniform standard. All money received was to be utilized for that purpose. We stated therein, with regard to the existence of a trust (p. 997) :

Close analysis of the subscription contracts entered into between petitioner and subscribing stations and networks, the understanding of the parties with regard to these contracts, and the performance of petitioner in execution of these contracts persuades us that the parties intended that BMB receive the subscription fees in trust for the subscribers to carry out Study No. 1. We find a reasonable certainty as to the property, the objects and the beneficiaries, and in such a situation no particular form of words is necessary to create a trust. *Chicago, Milwaukee & St. Paul Railway Co.* v. *Des Moines Union Railway Co.*, 254 U.S. 196.

There are no specific words of trust in the present case but we conclude, just as in *Broadcast Measurement Bureau, Inc., supra*, that as to all funds received a trust was created by virtue of the contractual agreements, the bylaws and charter, the operations of Advertising itself, and the intentions of all parties concerned.

While it is true that strictly speaking the funneling of funds to Advertising is not the equivalent of the flow of water through a conduit, the utilization of this analogy shows that an intermediary may be employed as a depository for funds in trust which are destined for an ultimate use that is specified within defined limits. The benefit, profit, or gain is not to accrue to the intermediary but rather to some other entity. The fact that no benefit, profit, or gain accrues to

Advertising as an entity along with the fact that a trust relationship does exist, is the primary reason for exclusion of the funds from gross income. This is the case here. Thus, even though the money is not required to be spent in one year, nevertheless, the sums remaining unspent, are still restricted to future use for advertising. Likewise, the various incidental programs conducted by Advertising, such as the incentive program for salesmen and the car-locator service, do not distract from the fact that the funds do not result in any benefit, profit, or gain to Advertising.

We find and hold, therefore, that the funds received by Advertising, both those from Ford and from its dealers, are not includable in gross income.

Because of concessions,

*Decision will be entered under Rule 50.*